**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

OCTOBER 30, 2025

~~Stgnc, C.J.~~
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
OCTOBER 30, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 103251-0 |
| Respondent, | EN BANC |
| v. | |
| LOLA FELIPA LUNA, | Filed: October 30, 2025 |
| Petitioner. | |

STEPHENS, C.J.—Lola Felipa Luna got in a fight with S.P.T., another teenage girl she knew only through social media. S.P.T. arrived outside Luna's home and started the fight by punching Luna, who responded using her pocketknife. S.P.T. died of her injuries, and the State charged Luna with murder, causing her to be tried as an adult.

At trial, the State was allowed to show social media posts by Luna and video of her police interrogation to argue that she had a preexisting fixation on stabbing someone and showed no remorse after the fight. Luna argued self-defense and offered additional social media evidence, including an image she was sent before the

fight, which she believed showed S.P.T. threatening her with gang violence. Following 13 days of trial, a jury found Luna guilty of intentional but not premeditated murder.

Luna challenges several evidentiary rulings and argues that the court should have applied newly enacted RCW 13.40.740 to exclude evidence from the interrogation. These rulings required the trial court to apply centuries-old legal doctrines—waiver of constitutional rights, res gestae, and the foundation requirement for evidence—in a modern context, involving two things the law has not always adequately understood: young people and social media. Courts must meaningfully consider a defendant's youth when assessing whether they understood their constitutional rights well enough to waive those rights and proceed with an interrogation. Courts must also examine social media evidence in the context in which it arises and in light of the purpose for which it is proffered.

We hold that the court here erred in applying these principles. While RCW 13.40.740 does not apply, Luna did not validly waive her right to silence, and evidence from her interrogation should not have been admitted. Further, several evidentiary rulings concerning social media evidence undermined the fairness of the trial and the soundness of the verdict. We therefore vacate the jury verdict and remand for further proceedings consistent with this opinion.

## FACTS

Luna and S.P.T. had never met in person before the day of their fight, but they knew of each other through social media. Luna was also connected on social media with H.D., a younger teenage girl who was close friends with S.P.T. and who thought of S.P.T. as a big sister. Luna had just turned 16 around a month before the fight with S.P.T. S.P.T. was also 16 at that time, and H.D. was about two years younger than both Luna and S.P.T.

In August 2020, five months before the fight with S.P.T., Luna started a fight with H.D. at the mall because H.D. had been talking to Luna's ex-boyfriend. The fight lasted less than a minute, and neither Luna nor H.D. was seriously injured. This was the only time Luna and H.D. met in person. Luna said she believed that after this fight, she had made up with H.D., and they became cordial and friendly with each other again on social media. 4 Verbatim Rep. of Proc. (VRP) at 1224-25.

On January 29, 2021, Luna received messages and videos from H.D. and other people, seeking a fight with Luna. They sent her addresses of houses for her to go to that night so they could fight. Luna declined the invitation to fight and went to sleep.

The next day, S.P.T. contacted H.D. saying she wanted to fight Luna because they "had drama," part of which related to the earlier fight at the mall between Luna and H.D. 2 VRP at 456-57. S.P.T. asked H.D. to text Luna and say that H.D. wanted

to fight Luna. H.D. did so. This surprised Luna because she thought that any prior issues with H.D. had been dealt with, including those from the night before. 2 VRP at 457; 4 VRP at 1318. Luna replied by sending H.D. her address and telling H.D. to come to her house. Luna testified she did not actually believe that H.D. wanted to fight her and expected that even if she did, they could talk through their issues and avoid fighting. 4 VRP at 1318-19. Unbeknown to Luna, H.D. had sent the address to S.P.T. One of S.P.T.'s friends drove her to Luna's house, and another of S.P.T.'s friends and S.P.T.'s infant daughter came along in the car. H.D. did not go with them.

After responding to H.D.'s message, Luna communicated with two of her friends about H.D. They shared a video of the earlier mall fight between Luna and H.D., which Luna had posted on TikTok shortly after that fight with music added to it.

At some point before S.P.T. arrived at her house, Luna received a text saying that H.D. was six minutes away, so she prepared to step outside her front door. Before stepping outside, she looked through a drawer in her dining room for her pocketknife and put it in her pocket. Luna testified that she put her pocketknife in her pocket or purse every time she stepped out of her house, and that she carried it for multiple reasons, including opening packages and self-protection. 4 VRP at 1320.

Luna opened her front door and stood in the doorway, looking outside. As she started to turn back inside, she heard yelling coming from the street, which is several steps down a slope from her front yard. She stepped outside onto the porch and then further down onto a paved walkway leading to the gate in the chain link fence that surrounds her house. She then saw someone she did not immediately recognize walk up the steps to her house, come through the gate, and continue into the yard to stand in front of her. After a second, Luna recognized this person as S.P.T.

Luna and S.P.T. began talking, and their exchange turned into a verbal altercation. Luna testified that she became fearful that the verbal altercation would turn physical, so she pulled the pocketknife out of her left pocket, slipped it behind her back, opened it up, and held it concealed behind her back in her right hand. 4 VRP at 1324-25.

The altercation turned physical when S.P.T. came at Luna and punched her in the head with her right fist. Luna unsuccessfully attempted to block the first punch with her left hand, and when the punch hit her head, she reacted by starting to stab at S.P.T. with the pocketknife in her right hand. S.P.T. continued to punch Luna, mostly in the head, and Luna continued to slash or stab S.P.T. with her pocketknife. S.P.T. had a hold on Luna and pulled her head down so that Luna could only see their feet. At some point, S.P.T. pushed Luna up against the chain link fence.

Eventually, Luna stopped slashing with her pocketknife, and S.P.T. continued punching her around five more times before stopping. In total, S.P.T. punched Luna around 38 times and Luna slashed or stabbed S.P.T. around 27 times. 4 VRP at 1395-96.

The fight lasted less than 1 minute. One of S.P.T.'s friends and Luna's boyfriend each captured the fight on a cell phone video.[1] After the fight, S.P.T. walked back down the steps and across the street to the car she had arrived in, and Luna went inside her house. Around 5 or 10 minutes later, four police officers arrived at Luna's front door. Luna's stepdad answered the door, and the police asked to speak with Luna, who came to the door. The police asked to come inside to talk, and Luna's stepdad allowed them to do so. They did not give Luna a *Miranda*[2] warning at this time. Police summoned medical aid from the fire department to assess Luna's injuries. The aid personnel bandaged Luna's hands and advised her that she may need stitches in the future but that it was not urgent and she did not need to go to the hospital immediately.

After a brief interaction, police arrested Luna, placed her in hand restraints, read her a *Miranda* warning,[3] and transported her to the Bremerton police station.

---

[1] The video taken by Luna's boyfriend was shown to the jury. *See* Ex. 103.

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] This *Miranda* warning included language advising juveniles that their statements may be used in both juvenile court and adult court, whichever court they may be prosecuted in. *See* 3 VRP at 621. Otherwise, the language of the *Miranda* warning was the same as for adults.

At some point, Luna's mother spoke with one of the responding officers and demanded that she or an attorney be present before Luna was questioned. The officer said that she understood the request and would communicate it to her supervisor. There is no evidence that this request was ever communicated to anyone else.

Police transported Luna to the police station at around 1:55 PM, roughly 20 to 30 minutes after the fight ended. She was taken straight to an interrogation room. She complained that her head hurt, she felt light-headed and dizzy, and "the room felt like it was at a slant." 4 VRP at 1352. Medical personnel checked her blood sugar and vital signs, but otherwise did not administer any aid or tests, and determined that she did not need further medical attention and could be interrogated.

After Luna was in the interrogation room for roughly half an hour, a detective entered the room. He offered Luna water and crackers, and asked officers to move her handcuffs to the front so she could eat and drink. He then asked to have her handcuffs removed so he could take photos of the injuries to her hands. He allowed the handcuffs to remain off and left the room to give her time to eat and drink. Luna was also allowed to go to the bathroom.

When the detective reentered the interrogation room, he read Luna a *Miranda* warning with the language specific to juveniles, and she verbally indicated that she understood. He did not give her a written warning or a form to sign. He did not tell Luna that she could have her mother present with her during the interrogation. Luna

did not voice any confusion or ask any questions about her rights. She also did not ask for an attorney or to have anyone with her at this time.

The detective proceeded to interrogate Luna, and she answered his questions.[4] She did not mention having been scared of S.P.T. prior to the fight and described anger as the reason she stabbed S.P.T. She said that there was never a time during the fight when S.P.T. overpowered her and that she never saw S.P.T. with any weapons on the day of the fight. When asked the reason why she stopped stabbing S.P.T., Luna stated that she became physically too tired to continue. The detective never asked Luna if she was afraid of S.P.T. At some point, the detective asked Luna about her injuries, and she said that she felt better than when the medical personnel checked on her just prior to the interrogation, but that her head still hurt. The detective testified that throughout the interrogation, Luna seemed flippant and did not demonstrate any signs of remorse or shock. 3 VRP at 693. He stated that certain details of Luna's story, such as when she pulled her pocketknife out of her pocket and opened it, seemed to change slightly each time she described the sequence of events. 5 VRP at 1454.

Luna was unaware of S.P.T.'s condition while she was being interrogated. During a break in the interrogation, the detective learned from his colleagues that

---

[4] The interrogation was videotaped, and an edited version of the video was shown to the jury. *See* Ex. 102.

8

S.P.T. had died.[5] He reentered the interrogation room and told Luna that he had an update about S.P.T.'s condition. Luna asked if it was good news or bad news, and he said that it was "bad news." 5 VRP at 1455. At least twice, he asked Luna if she wanted to hear the details of this bad news and she said no. Luna did not otherwise ask him for any updates on S.P.T.'s condition.

After being in the interrogation room for roughly five hours, Luna asked to speak to her mother and was allowed to do so. Luna learned through this conversation that S.P.T. had died. After speaking with her mother, and at her mother's suggestion, Luna inquired about getting an attorney. After confirming that Luna was asking to be provided an attorney, the detective ceased questioning.

## PROCEDURAL HISTORY

The State charged Luna with three alternative counts of murder: murder in the first degree (premeditated intentional murder), murder in the second degree (intentional but not premeditated murder), and murder in the second degree (felony murder predicated on assault in the second degree). All charges came with the

---

[5] S.P.T. died of her injuries after being taken to a local hospital by her friends and then airlifted to Harborview Medical Center in Seattle. Her care was delayed because the local hospital had recently closed its emergency department, weather prevented the helicopter from landing at the local hospital, and she had to be transported by ambulance to the Bremerton airport in order to be airlifted to Harborview. At trial, Luna suggested that this delay, as well as the combination of ketamine used in S.P.T.'s treatment with her existing blood alcohol level, broke the chain of causation between Luna's actions and S.P.T.'s death. The trial court instructed the jury not to consider this causation theory, and none of the arguments in Luna's petition for review relate to this theory.

special allegation that she was armed with a deadly weapon. Luna was tried in adult court. *See* RCW 13.04.030(e)(v)(A) (providing exception to exclusive original jurisdiction in juvenile court when a juvenile is alleged to have committed any "serious violent offense as defined in RCW 9.94A.030" at age 16 or 17); RCW 9.94A.030(46) (defining "serious violent offense" to include murder in the first and second degrees).

Before trial, the State moved to admit character evidence under various exceptions to ER 404(b). As relevant here, this evidence included the video with music that Luna posted on TikTok of the mall fight between her and H.D., a video Luna posted on TikTok around Halloween 2020 that referenced the movie *The Purge*[6] and showed Luna stabbing a large knife toward the camera, and a comment Luna posted on Instagram that mentioned her having "stabbing energy." *See* Exs. 99, 100, 89. The court determined that the mall fight video was admissible under an exception to ER 404(b) as res gestae evidence, and that the *Purge* video and "stabbing energy" comment were admissible under the exceptions to ER 404(b) for evidence of motive, intent, and premeditated intent.

---

[6] *The Purge* depicts a dystopian United States in which, once a year, all crime, including murder, becomes legal for a 12-hour period known as "the Purge." Alex Abad-Santos, *The Purge Movie Franchise Explained*, Vox (July 1, 2016, 03:00 PDT), https://www.vox.com/2016/7/1/12054200/purge-movie-explained.

During motions in limine, Luna sought to admit S.P.T.'s toxicology report, which showed a blood alcohol concentration of 0.082, and evidence about S.P.T. that explained her fear of S.P.T.  The court excluded both categories of evidence but observed that some evidence about S.P.T. could become admissible if Luna showed through an offer of proof that she had knowledge of the evidence prior to the fight.

After an offer of proof during trial, the court admitted several of S.P.T.'s social media posts that Luna testified made her fearful of S.P.T., with limiting instructions that they be used only to assess Luna's state of mind during the fight. The court excluded several other social media posts, as well as an image that was sent to Luna before the fight by an unknown third party on Snapchat with text claiming to put a "green light" on Luna and stating that S.P.T. had a whole gang ready to take Luna out. *See* Ex. 163.  The court explained that there was insufficient foundation to tie the image to S.P.T., making it not relevant, and that it was hearsay. 4 VRP at 1164.  Relatedly, the court also excluded as irrelevant a screenshot from the website Urban Dictionary defining "green light" as a term used in gang culture to say that a gang has a hit out on someone. *See* Ex. 165.

During trial, the court held a CrR 3.5 hearing to determine the admissibility of Luna's statements from the interrogation.[7]  Luna testified that although she told

---

[7] The court was unable to hold this CrR 3.5 hearing before trial because the detective was out of town.  The court also held a different CrR 3.5 hearing during motions in limine to determine the

the detective that she understood the *Miranda* warning, she did not fully understand all parts of it, and she only "kind of" understood what was going on when she was at the police station. 3 VRP at 636. Specifically, she did not fully understand the warning that "[a]nything can and will be used against you." *Id.* She also testified that while she understood her right to have an attorney, she did not understand how to actually get an attorney or whether she needed to tell the detective she wanted one. She said that she wanted her mom to be with her during the interrogation but she did not think that would be allowed, and she thought she had to do what the detective said. She stated that while she had been questioned by police before, she had never previously been arrested, given *Miranda* warnings, or subjected to a custodial interrogation. The court found that Luna was in custody during the interrogation and that her statements "were made freely, knowingly, and voluntarily after being properly advised of her rights, and as such, her statements are admissible." Clerk's Papers (CP) at 431; *see also* 3 VRP at 657-59.

In its closing argument, the State relied heavily on Luna's social media posts, particularly the *Purge* video, to argue that Luna was "fixated on stabbing someone" for months before the incident. 5 VRP at 1647-49, 1753. The State pointed to

admissibility of Luna's statements to police at her home before she received *Miranda* warnings. It held those statements to be admissible because they were made voluntarily and Luna was not in custody at the time, and Luna does not challenge the admission of those statements on appeal. Findings of fact and conclusions of law for the two CrR 3.5 hearings were combined and issued together on the last day of trial. *See* Clerk's Papers at 427-31.

12

Luna's demeanor and inconsistent statements in the interrogation to argue that she not only lacked remorse but was even happy and prideful after killing S.P.T. The State further argued that Luna did not fear S.P.T. at all and that she deliberately modified her story to better fit a narrative of self-defense. The State also argued that premeditation could be found based on Luna forming the intent to kill S.P.T. over several months, over the morning before the fight, or just over the course of the fight itself.

In contrast, Luna argued in closing that she was afraid and acted in self-defense during the fight. She explained that she had a reasonable fear of S.P.T. based on the social media posts she had seen. Luna also emphasized the facts showing that she never expected S.P.T. to show up at her house, that S.P.T. weighed 20 pounds more than her, and that S.P.T. threw the first punch. She argued that her own social media posts were not probative of any actual intent to kill but, rather, reflected typical teenage use of social media. Luna also successfully requested a jury instruction on manslaughter in the second degree as a lesser included charge to both counts of intentional murder (but not felony murder).

The jury found Luna not guilty of premeditated murder, but guilty on both counts of murder in the second degree, and it found she was armed with a deadly weapon. After trial, the court dismissed the felony murder charge to avoid double jeopardy.

Luna appealed, challenging several evidentiary rulings, and the Court of Appeals affirmed in an unpublished opinion. *State v. Luna*, No. 57943-0-II (June 11, 2024), https://www.courts.wa.gov/opinions/pdf/D2%2057943-0-II%20Unpublished%20Opinion.pdf. The Court of Appeals rejected all of Luna's arguments except one: it agreed with her that the *Purge* video and the "stabbing energy" comment should not have been admitted because they could have confused the jury, who may not have understood TikTok trends and slang terms used by teenagers. However, the court concluded that the error was harmless in light of the remaining evidence of Luna's intent. Luna also argued for the first time on appeal that recently enacted RCW 13.40.740 should have applied and barred evidence from the interrogation. The Court of Appeals reached the merits of this issue and held that the legislature did not intend RCW 13.40.740 to apply to custodial interrogations of juveniles occurring prior to the date the statute went into effect.

Luna petitioned for review, raising many of the same arguments as in the Court of Appeals. We initially granted review "only on the issue of statutory retroactivity." Ord. Granting Rev., *State v. Luna*, No. 103251-0 (Dec. 4, 2024). Following oral argument, however, we granted the petition in full, directed the

14

parties to submit supplemental briefing on the remaining issues, and set the case for reargument. Ord. Granting Rev., *State v. Luna*, No. 103251-0 (Mar. 12, 2025).[8]

ANALYSIS

We begin by examining the admissibility of evidence from Luna's interrogation. We first address Luna's argument that RCW 13.40.740, which requires juveniles to be offered counsel prior to an interrogation, applies to exclude this evidence. Finding the statute inapplicable, we then consider whether Luna validly waived her constitutional rights before being interrogated. We next turn to the admissibility of the social media evidence, starting with the "green light" image, continuing with the mall fight video, and concluding with the *Purge* video and "stabbing energy" comment. The only issue before us with regard to the *Purge* video and "stabbing energy" comment is whether their erroneous admission is harmless, and we also consider harmless error with respect to all challenged evidentiary rulings. Because we ultimately conclude that reversal is warranted based on key evidentiary rulings, we choose not to address the remainder of Luna's challenges to excluded evidence.

---

[8] We accepted an amicus brief from a collective of juvenile justice and racial justice groups before the first oral argument, and a second brief by the same group before the second oral argument. Amici are Leading Our Children Off Streets, League of United Latin American Citizens Washington, Center for Civil Rights and Critical Justice at Seattle University School of Law, and TeamChild (Amici Curiae).

As to evidence from the interrogation, Luna raises two distinct challenges. First, she argues that RCW 13.40.740, which was enacted before her interrogation and became effective before trial, applies to prohibit the admission of her statements. The State counters that Luna failed to preserve this issue because she did not raise it in the trial court and that the statute was not in effect until after her interrogation. Second, Luna asserts a constitutional challenge to evidence from the interrogation on the ground that she did not knowingly, intelligently, and voluntarily waive her constitutional rights. The State argues that she failed to preserve this challenge because she has not adequately identified the trial court's findings of facts she contests or shown why they are not supported by substantial evidence.

We begin with Luna's argument based on RCW 13.40.740.

## I. RCW 13.40.740 does not apply to bar evidence of Luna's interrogation, which took place before its effective date

RCW 13.40.740 was signed into law 1 ½ years before and went into effect 10 months before the relevant CrR 3.5 hearing at Luna's trial. *See* LAWS OF 2021, ch. 328, § 7 (noting filing date of May 18, 2021 and effective date of January 1, 2022); 3 VRP at 617-59 (CrR 3.5 hearing held midtrial on November 16, 2022). The State is correct that Luna's argument based on the statute could have been raised at any point during that time and is therefore unpreserved. Appellate courts generally "refuse to review any claim of error which was not raised in the trial court," and this

16

issue does not clearly fall into an exception for errors that may be raised for the first time on appeal. RAP 2.5(a). Nonetheless, the Court of Appeals exercised its discretion to reach the merits and interpret the recently enacted law, and we granted review, received briefing, and heard oral argument on this issue. In the interests of justice and providing guidance to lower courts, we exercise our discretion to reach this issue.

RCW 13.40.740 states in relevant part:

(1) Except as provided in subsection (4) of this section, law enforcement shall provide a juvenile with access to an attorney for consultation, which may be provided in person, by telephone, or by videoconference, before the juvenile waives any constitutional rights if a law enforcement officer:

(a) Questions a juvenile during a custodial interrogation;

(b) Detains a juvenile based on probable cause of involvement in criminal activity; or

(c) Requests that the juvenile provide consent to an evidentiary search of the juvenile or the juvenile's property, dwellings, or vehicles under the juvenile's control.

(2) The consultation required by subsection (1) of this section may not be waived.

(3) Statements made by a juvenile after the juvenile is contacted by a law enforcement officer in a manner described under subsection (1) of this section are not admissible in a juvenile offender or adult criminal court proceeding, unless:

(a) The juvenile has been provided with access to an attorney for consultation; and the juvenile provides an express waiver knowingly, intelligently, and voluntarily made by the juvenile after the juvenile has been fully informed of the rights being waived as required under RCW 13.40.140;

(b) The statement is for impeachment purposes; or

(c) The statement was made spontaneously.

Determining whether a statute applies in a case that was pending when the statute came into effect is a question of statutory interpretation. *See, e.g.*, *State v. Jenks*, 197 Wn.2d 708, 487 P.3d 482 (2021). We review questions of statutory interpretation de novo. *See id.* at 713 (citing *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). Our fundamental objective in statutory interpretation "is to ascertain and carry out the Legislature's intent." *Campbell & Gwinn*, 146 Wn.2d at 9. The legislature can choose to apply a statute retroactively, subject to constitutional limitations not argued here. *See, e.g.*, *State v. Pillatos*, 159 Wn.2d 459, 474-77, 150 P.3d 1130 (2007) (discussing the ex post facto clauses of the state and federal constitutions).

Of course, a threshold question is whether application of the statute to the facts of a particular case would be in fact retroactive. "A statute is not retroactive merely because it applies to conduct that predated its effective date." *Pillatos*, 159 Wn.2d at 471. "The key . . . is whether the event triggering" a statute's application took place before or after the statute went into effect. *State v. Belgarde*, 119 Wn.2d 711, 722, 837 P.2d 599 (1992). We therefore consider the relevant triggering event for the application of RCW 13.40.740.

18

A. The triggering event for application of RCW 13.40.740 is police seeking a waiver of a juvenile's rights without providing access to an attorney for consultation

Luna argues that the triggering event for the application of subsection (3) is the State's attempt to admit the statement into evidence in a criminal proceeding, not the custodial interrogation and preceding events. Our triggering event analysis focuses on "'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Pillatos*, 159 Wn.2d at 471 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994)). Before RCW 13.40.740 went into effect, police could choose to provide access to an attorney for consultation before beginning an interrogation, but there were no specific consequences if they decided not to do this. RCW 13.40.740 provides a specific consequence that flows from interrogating a juvenile without first providing them access to an attorney for consultation: the statements made in the interrogation will generally be inadmissible. The statute's clear import and effect support a conclusion that the decision to interrogate Luna without providing an attorney consultation is the relevant triggering event.

Further, subsection (3) references subsection (1) in describing when statements will be inadmissible: "Statements made by a juvenile after the juvenile is contacted by a law enforcement officer *in a manner described under subsection (1)* of this section are not admissible . . . ." RCW 13.40.740(3) (emphasis added). The

19

legislature's choice to tie inadmissibility in subsection (3) to a definition in subsection (1) shows legislative intent to treat the events described in subsection (1), i.e., those surrounding the questioning, as the triggering event.

Considering the language and structure of RCW 13.40.740, we hold that the triggering event for application of subsection (3) is law enforcement's act of contacting a juvenile in a way described in subsection (1) and seeking a waiver of their constitutional rights without providing access to an attorney for consultation. Because Luna's custodial interrogation without an attorney consultation took place before the effective date of RCW 13.40.740, the statute is inapplicable unless grounds exist for its retroactive application.

B. RCW 13.40.740 is not remedial for purposes of retroactive application because it creates a new substantive right for juveniles

Our analysis of retroactivity begins with "the rule of prospective application, which states that statutes generally apply prospectively from their effective date unless a contrary intent is indicated." *State v. Jefferson*, 192 Wn.2d 225, 245, 429 P.3d 467 (2018) (plurality opinion); *see also State v. Humphrey*, 139 Wn.2d 53, 57, 983 P.2d 1118 (1999); *Macumber v. Shafer*, 96 Wn.2d 568, 570, 637 P.2d 645 (1981). We have recognized two exceptions to the rule of prospective application for types of statutes that will apply retroactively even if no retroactive intent is indicated in the statute. First, an amendment will apply retroactively if it "is curative

and 'clarifies or technically corrects ambiguous statutory language.'" *In re Det. of Elmore*, 162 Wn.2d 27, 35-36, 168 P.3d 1285 (2007) (quoting *Barstad v. Stewart Title Guar. Co.*, 145 Wn.2d 528, 536-37, 39 P.3d 984 (2002)). There is no argument here that RCW 13.40.740 meets this test. Second, a statute will apply retroactively if it "is remedial in nature and retroactive application would further its remedial purpose." *Macumber*, 96 Wn.2d at 570. This is the focus of Luna's argument, though we also consider whether there is express legislative intent to apply retroactively.

A statute is remedial when it relates to "practice, procedure, or remedies." *Miebach v. Colasurdo*, 102 Wn.2d 170, 181, 685 P.2d 1074 (1984). In the context of retroactivity, the exception for remedial statutes refers to statutes that prescribe a new or different remedy for a *preexisting* right, not those that grant a new right (or establish a new liability) with an accompanying remedy. *See Agency Budget Corp. v. Wash. Ins. Guar. Ass'n*, 93 Wn.2d 416, 426, 610 P.2d 361 (1980) (explaining that because statute "created a new cause of action and corresponding liability, there is no presumption of retroactivity"). For example, in *Macumber*, we considered a statute remedial when it updated for inflation the amount that a person could claim under the preexisting statutory right to a homestead exception in bankruptcy. 96 Wn.2d at 570. In contrast, in *Humphrey*, we found that an increase in the victim penalty assessment from $100 to $500 was not remedial, despite the legislature's

21

explicit language that it should be, because it effectively created a new liability and did not merely adjust for inflation. 139 Wn.2d at 62-63. In *Miebach*, we considered a statute remedial when it required a purchaser of property at a sheriff's sale to provide periodic notice to the debtor of their preexisting right of redemption, although we concluded that retroactive application would disturb the vested rights of the purchaser. 102 Wn.2d at 180-81; *see also* LAWS OF 1899, ch. 53, § 9 (establishing statutory right of redemption for debtors).

Luna argues that RCW 13.40.740 is remedial because, like *Miranda*, it provides a procedural safeguard, which protects a juvenile's preexisting substantive right against self-incrimination. It may be that a purpose of RCW 13.40.740 is to prevent violations of juveniles' constitutional rights, but the failure to provide access to attorney consultation as described in subsection (1) is not itself a constitutional violation. State and federal courts have long held that a defendant may validly waive the right against self-incrimination though they have yet to consult with an attorney. *See, e.g.*, *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967); *Dutil v. State*, 93 Wn.2d 84, 606 P.2d 269 (1980). Given this precedent, RCW 13.40.740 cannot be understood as providing a remedy for a preexisting constitutional right.[9]

---

[9] Luna suggests an alternative argument based on the U.S. Supreme Court's treatment of *Miranda*, which was made applicable to cases pending when it was decided. *See Michigan v. Tucker*, 417 U.S. 433, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). We also recognize that "'[a] new rule for the conduct of criminal prosecutions is to be applied . . . to all cases, state or federal, pending on direct review or not yet final.'" *State v. Bailon Wences*, 189 Wn.2d 675, 677, 406 P.3d

22

The State concedes, and we agree, that subsection (3) operates in an essentially remedial way, but the remedy it provides is for a violation of the new substantive right to be provided access to an attorney for consultation before being asked to waive certain constitutional rights. We hold that RCW 13.40.740 is not remedial for purposes of retroactive application because it does not provide a remedy for a preexisting constitutional or statutory right.

We turn next to the only remaining basis for retroactivity and consider whether RCW 13.40.740 expresses legislative intent to apply retroactively.

C. RCW 13.40.740 lacks the type of strong language we have previously found to express legislative intent for retroactive application

Luna argues that even if the statute is not remedial under the above analysis, we should hold that the legislature expressly intended for it to apply retroactively.

RCW 13.40.740(3) lacks the type of strong language we have relied on in our few cases finding express legislative intent for retroactivity. It does not say that statements made in an interrogation without an attorney consultation are "not ever" admissible, *see State v. Zornes*, 78 Wn.2d 9, 13-14, 475 P.2d 109 (1970) (plurality opinion), nor does it say that juveniles "'may not be subjected to criminal

---

267 (2017) (alterations in original) (quoting *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 326, 823 P.2d 492 (1992)). However, this precedent speaks to new rules of criminal procedure announced in court decisions, not to statutes enacted by the legislature addressing law enforcement interrogation procedures, and thus it does not guide our analysis of whether RCW 13.40.740 provides a remedy for a preexisting right.

prosecution'" using statements they made in an interrogation without a consultation, *State v. Grant*, 89 Wn.2d 678, 683-84, 575 P.2d 210 (1978) (quoting former RCW 70.96A.010 (1972), *repealed by* LAWS OF 2016, Spec. Sess., ch. 29, § 601). Rather, as discussed above, subsection (3) explicitly ties admissibility to the definition in subsection (1), focusing on interrogation procedures. This expresses legislative intent to exclude statements obtained through a violation of the new statutory right granted to juveniles in subsection (1), a right that juveniles did not possess until the statute went into effect in 2022.[10]

Moreover, the legislature explicitly stated that if "specific funding for the purposes of" RCW 13.40.740 was not provided for in the budget bill considered later in the same legislative session, RCW 13.40.740 would be "null and void." LAWS OF 2021, ch. 328, § 6. The legislature's decision to make the effectiveness of RCW 13.40.740 contingent on funding for an attorney consultation hotline that did not exist at the time Luna was interrogated further indicates legislative intent that the statute apply prospectively.

---

[10] *Zornes* and *Grant* both involved Washington's general saving statute, enacted in 1901, which creates a presumption of prospective application whenever a criminal statute is amended or repealed, "unless a contrary intention is expressly declared therein." RCW 10.01.040. The parties dispute whether the saving statute applies to RCW 13.40.740, but we need not decide that issue. As explained above, our recent precedent recognizes a presumption of prospective application for all statutes, criminal or otherwise, unless contrary intent is indicated. We therefore regard precedent interpreting legislative intent for retroactivity under the saving statute as applicable to interpreting legislative intent for retroactivity under the general presumption of prospective application.

We hold that RCW 13.40.740 does not express legislative intent to apply retroactively. Because RCW 13.40.740 does not provide a remedy for a preexisting right nor express legislative intent to apply retroactively, we hold that the statute is inapplicable and does not bar the admission of evidence from Luna's interrogation.

We turn next to Luna's constitutional challenge to the validity of her waiver of rights prior to being interrogated, starting with the State's contention that Luna failed to preserve this argument on appeal.

II. Admitting evidence of Luna's interrogation violated her right against self-incrimination because substantial evidence does not support the trial court's finding that she sufficiently understood her rights and the consequences of waiving them

There is no dispute that Luna opposed the admission of her interrogation statements at the CrR 3.5 hearing during trial. However, the State argues that Luna waived her constitutional challenge at the Court of Appeals because she merely cited several of the trial court's findings of fact but "failed to explain how the findings were not supported by substantial evidence." Second Suppl. Br. of Resp't at 26-27. We disagree.

In Luna's Court of Appeals brief, she assigns error to a number of the trial court's findings of fact from the CrR 3.5 hearing to argue that her waiver of constitutional rights was not knowing, intelligent, and voluntary. Br. of Appellant at 3-4 (Wash. Ct. App. No. 57943-0-II (2023)). She repeats the list of challenged findings of fact in the relevant part of her argument section. *Id.* at 65. She then

highlights other facts in the record that the trial court's findings "fail to consider." *Id.* For example, finding of fact XVI states that Luna appeared to be "capable of understanding" her rights and finding of fact XXVIII states that she in fact "understood her rights." CP at 428-30. Luna highlights her age, lack of experience with police, and recent head trauma to argue that she did not in fact understand her rights. Br. of Appellant at 65 (Wash. Ct. App. No. 57943-0-II (2023)).

It is true that Luna could have explained in greater detail which of her facts undermined which specific findings of fact issued by the trial court. As discussed below, Luna's argument does not meaningfully challenge all of the findings of fact that she lists. However, RAP 10.3(g) requires only that an appellant enumerate an assignment of error to each challenged finding, which Luna did at the beginning of her Court of Appeals brief. RAP 10.3(a)(6) requires that the argument be supported by "citations to legal authority and references to relevant parts of the record." Luna's briefs lay out the relevant legal test for a waiver of rights and highlight facts in the record that undermine the most crucial findings of fact. We conclude that Luna sufficiently preserved a challenge to the trial court's conclusion that her waiver was knowing, intelligent, and voluntary.

The state and federal constitutions guarantee people the right not to "be compelled in any criminal case" to give evidence against themselves. WASH. CONST. art. I, § 9; U.S. CONST. amend. V. Included in these provisions is the right to remain

silent in response to attempted interrogation by police and the right to have an attorney present during any interrogation. *State v. Earls*, 116 Wn.2d 364, 378, 805 P.2d 211 (1991). Unless a defendant waives these rights, statements they make during a custodial interrogation may not be introduced at trial. *See Miranda*, 384 U.S. 436. "There is no presumption in favor of a waiver of constitutional rights." *State v. Emmett*, 77 Wn.2d 520, 522, 463 P.2d 609 (1970) (citing *State v. Davis*, 73 Wn.2d 271, 438 P.2d 185 (1968), *overruled in part by State v. Adbulle*, 174 Wn.2d 411, 275 P.3d 1113 (2012)); *see also Hodges v. Easton*, 106 U.S. 408, 412, 1 S. Ct. 307, 27 L. Ed. 169 (1882) ("[E]very reasonable presumption should be indulged against . . . waiver."). We have held that the state and federal constitutions are coextensive in the context of deciding whether a defendant has waived these rights. *State v. Russell*, 125 Wn.2d 24, 57, 882 P.2d 747 (1994) (citing *Earls*, 116 Wn.2d at 374-75).

Once warnings are given advising a person of their right to remain silent and their right to have an attorney, "[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Miranda*, 384 U.S. at 475 (citing *Escobedo v. Illinois*, 378 U.S. 478, 490 (1964)). The State does not need to show an "express written or oral statement of waiver" and waiver

can be "inferred from the actions and words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979). If the State "shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Berghuis v. Thompkins*, 560 U.S. 370, 384, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010).

Courts consider the totality of circumstances, including the defendant's condition, age, and experience, and the conduct of police, to determine whether a waiver of these constitutional rights is knowing, intelligent, and voluntary. *State v. Aten*, 130 Wn.2d 640, 663-64, 927 P.2d 210 (1996) (citing *State v. Rupe*, 101 Wn.2d 664, 679, 683 P.2d 571 (1984) (plurality opinion)); *see also Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). A defendant's prior experience with police, crime, custodial interrogations, and the criminal justice system in general is particularly relevant. *See, e.g., Fare v. Michael C.*, 442 U.S. 707, 726, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979); *State v. Unga*, 165 Wn.2d 95, 109, 196 P.3d 645 (2008). "We will not disturb a trial court's conclusion that a waiver was voluntarily made if the trial court found, by a preponderance of the

evidence, that the statements were voluntary and substantial evidence in the record supports the finding." *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007) (citing *State v. Broadaway*, 133 Wn.2d 118, 129, 942 P.2d 363 (1997)).

Judicial inquiry into whether a person has validly waived their rights to silence and counsel has "two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (citing *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981); *Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The first dimension corresponds to the word "voluntary" and the second dimension corresponds to the words "knowing" and "intelligent." *See State v. Blanchey*, 75 Wn.2d 926, 934, 454 P.2d 841 (1969) ("[T]here is a difference between a voluntary admission and a knowing waiver."). But courts frequently use the word "voluntary" as shorthand for both dimensions. *See, e.g.*, *Aten*, 130 Wn.2d at 664-65 (using "voluntary" to describe both lack of coercion and defendant's understanding of her rights); *Athan*, 160 Wn.2d at 380; *see also Blanchey*, 75 Wn.2d at 936 (assuming trial court

considered whether waiver was "knowing" and "intelligent" despite court rule requiring court only to find confession "voluntary and admissible").

Luna challenges the following findings of fact:

## VIII.

That Officer Hoyson was told that the defendant stabbed the other party.[11]

. . . .

## XV.

That the defendant appeared to understand the Miranda warnings read to her.

## XVI.

That the defendant did not appear to be under the influence of any substances or suffering from any mental health issues at the time, and was capable of understanding.

## XVII.

That the defendant was calm in demeanor and had no questions after being read the Miranda warnings.

. . . .

## XXIV.

That aid was summoned to check the defendant after she complained of being light-headed, and aid determined her vital signs all looked good and she was not in need of additional medical attention at that time.

. . . .

---

[11] Citing finding VIII appears to be a mistake because Luna does not challenge the statements made at her home to Officer Hoyson in this appeal. Based on their numbering and placement relative to other findings, findings XV, XVI, and XVII may describe the circumstances of the statements made to Officer Hoyson, but it is not entirely clear. For purposes of the following analysis, we assume that these challenged findings relate to the circumstances of the custodial interrogation with the detective.

## XXVII.

That the defendant voiced no concern upon hearing her rights. She did not appear disoriented or under the influence of anything mind-altering.

## XXVIII.

That the defendant agreed to speak with the detective and understood her rights. No threats or promises were made to her.

## XXIX.

That the defendant knew she didn't have to answer questions. She stated she didn't know how to ask for an attorney, but she understood the warnings provided.

## XXX.

That the defendant was allowed to speak to her mother. After that conversation, the defendant did ask for an attorney and the interrogation stopped.

CP at 428-30.

Luna does not meaningfully challenge findings XV, XVII, XXIV, XXVII, or XXX. She does not dispute the events leading up to the interrogation or how the interrogation concluded, and she seems to acknowledge that to the detective, it appeared that she understood her rights because, when asked, she said she did. Luna also acknowledges that she received a proper *Miranda* warning and she does not allege a violation of *Miranda*. Although she uses the word "voluntary," she does not appear to argue that the police engaged in intimidation, coercion, or deception invalidating her waiver. Pet'r's Second Suppl. Br. at 28.

Rather, Luna's arguments focus on these facts in findings XVI, XXVIII, and XXIX about her state of mind at the time the interrogation started: that she "was capable of understanding [her rights]," that she actually "understood her rights" and the "warnings provided," and that she "knew she didn't have to answer questions." CP at 429-30. These facts are ultimately necessary to support the court's determination that her waiver was knowing and intelligent. She essentially argues that the unchallenged findings, combined with other facts in the record but not memorialized in discrete findings of fact, do not add up to substantial evidence that she sufficiently understood her rights.

Luna's argument highlights the distinction between a defendant *appearing* to understand their rights and *actually* understanding their rights, which is key to this second dimension of the waiver inquiry. "If there is substantial evidence that [a] defendant did not *in fact* realize that the detectives could use these statements against [them], then [they] did not make a knowing decision to waive [their] rights regardless of the 'voluntariness' of [their] statements. Of course it is impossible to establish conclusively what was going through [a] defendant's mind at the time [they] spoke to the detectives." *Blanchey*, 75 Wn.2d at 934-35 (emphasis added). As with any legal inquiry into a person's state of mind, fact finders must rely on objective facts and circumstances, combined with the defendant's testimony if offered, to infer what was going through their mind at the beginning of an

interrogation. If substantial evidence shows only that the defendant appeared to understand their rights, not that they in fact understood those rights, then the State has not met its "heavy burden of proof" for a valid waiver. *Id.* at 935.

Two cases involving juveniles are essential to discuss here. First, in *Michael C.*, the U.S. Supreme Court held that the totality of the circumstances test applies equally to juveniles and adults in this context. 442 U.S. at 727-28. In doing so, the Court held that a juvenile's request for their probation officer is not a per se invocation of the right to counsel, but it must be considered, along with the defendant's age and all other relevant facts, in the totality of circumstances. *Id.* Because the Court reversed the California Supreme Court's holding that the defendant had invoked their rights, the Court then considered the totality of the circumstances in assessing the validity of the defendant's waiver. *Id.* at 726. The Court noted that the police "took care to ensure that respondent understood his rights" and found "no indication in the record that [he] failed to understand what the officers told him." *Id.* The Court also found "no special factors indicat[ing] that [he] was unable to understand the nature of his actions" and noted that he was a "16 ½-year-old juvenile with considerable experience with the police," including multiple arrests, juvenile incarceration, and probation. *Id.*

The year after *Michael C.*, this court decided *Dutil*, which consolidated the criminal cases of three juvenile defendants. 93 Wn.2d at 85. We rejected the

argument that a juvenile's waiver of rights is per se invalid unless made in the presence of a "parent or other friendly adult."[12] *Id.* at 86. All three conceded that if we rejected this premise and the totality of circumstances test applied, their waivers were knowing, intelligent, and voluntary. *Id.* Based on this concession, we did not discuss in detail the circumstances of any of the interrogations, so we cannot either distinguish or analogize to the facts here. Still, *Dutil* highlights a central tension in assessing the validity of a waiver: there is no "right to be told the advantages and disadvantages of exercising [one's] rights," *id*. at 90, and yet a waiver cannot be knowing and intelligent unless a person understands "the consequences of waiving those rights," *Michael C.*, 442 U.S. at 725; *see also Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987) ("The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." (citing *Burbine*, 475 U.S. at 422; *Oregon v. Elstad*, 470 U.S. 298, 316-17, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985))).

---

[12] Luna and amici now ask us to "recognize a rebuttable presumption that youth cannot knowingly, voluntarily, and intelligently waive their rights in the absence of a caring adult or legal counsel." Second Amici Curiae Br. at 23; *accord* Pet'r's Answer to Second Br. of Amici Curiae at 10. This would conflict with the holding in *Dutil*, and the briefing does not attempt to show that *Dutil* is incorrect and harmful. Further, the State has not had a full opportunity to respond to this argument, as it was not raised until the second round of supplemental briefing. It is true that in *Dutil* we said we would "adhere to the rule" that the totality of the circumstances test applies equally to juveniles "[u]ntil we are shown that additional safeguards are necessary to protect children from those evils which the constitutional provisions were meant to guard against." 93 Wn.2d at 94. Without full arguments from both sides, we decline to address whether that showing has been made today.

Here, a number of objective facts weigh against finding that Luna actually understood her rights. She had recently turned 16 years old and had never been questioned or interrogated by police as a suspect before, let alone in a custodial setting. There was also no evidence Luna had ever been given a *Miranda* warning or exercised her right to silence or counsel before the day of the interrogation. *Cf. Blanchey*, 75 Wn.2d at 935 (finding defendant "had demonstrated his understanding of his rights by exercising them while in custody in Canada"). Further, she had just been in a fight in which she sustained dozens of blows to her head. Additional facts from her testimony also weigh against finding that she sufficiently understood her rights: her head hurt and she felt dizzy, light-headed, and like the room was at a slant at the beginning of the interrogation; she did not fully understand what it meant for her statements to be used against her in a court of law; she did not know how to request an attorney; and she thought she had to do what the detective said. On cross-examination at the hearing, Luna maintained that she did not understand these aspects of her rights or how to effectuate them. 3 VRP at 636-38; *cf. State v. Escobar*, noted at 162 Wn. App. 1045, slip op. at 8 (2011) (finding waiver when "'defendant testified while on direct that he did not understand his rights, but then on cross examination admitted that he understood each of the enumerated rights that were read to him'" (quoting court record)).

There are very few cases analyzing knowing and intelligent waiver for a person who has suffered recent head trauma. In *State v. Piatnitsky*, the defendant was interrogated hours after a fight in which he was punched in the head and had a beer bottle broken over his head. 170 Wn. App. 195, 200, 282 P.3d 1184 (2012), *aff'd*, 180 Wn.2d 407, 325 P.3d 167 (2014). He argued that his head trauma made his waiver of rights not knowing and intelligent, but the trial court disagreed, crediting detectives' testimony that Piatnitsky had only superficial cuts to his head, showed no signs of concussion, and appeared lucid throughout the interrogation. *Id.* at 205. Similarly, in *United States v. Bennett*, the defendant suffered a minor head injury during arrest, and the court found valid waiver, noting that he was "alert, coherent, and fully responsive" and "neither seriously injured nor heavily medicated." 604 F. App'x 11, 14 (2d Cir. 2015). Here, in contrast, Luna had been punched numerous times and was still dizzy and light-headed at the start of the interrogation. Although she was checked by medical personnel shortly after the fight and her injuries did not require immediate hospitalization, she reported their clear effect on her mental state. While Luna did respond during the interrogation that she felt better after eating some crackers, our waiver inquiry focuses on Luna's state of mind at the moment she first started answering the detective's questions.

The research on juveniles cited by Luna and amici has particular relevance here. Courts have considered a defendant's age in the totality of circumstances since

at least 1948, and some of the early cases reflect a greater appreciation of how youth impacts the ability to understand one's rights than some more recent cases, which do little more than list the defendant's age. *Contrast Haley v. Ohio*, 332 U.S. 596, 601, 68 S. Ct. 302, 92 L. Ed. 224 (1948) (plurality opinion) (refusing to "indulge" assumption that 15 year old boy given equivalent of *Miranda* warning "would have a full appreciation of that advice"), *and Gallegos v. Colorado*, 370 U.S. 49, 53, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962) (describing youth as "crucial factor" in totality of circumstances), *with Michael C.*, 442 U.S. at 726 (explaining that defendant being 16 ½ was not a "special factor[]" affecting his ability to understand his rights), *and Unga*, 165 Wn.2d at 108 (comparing 16 year old defendant to age of defendants in other cases to determine whether confession was voluntary). Within the context of the totality of the circumstances test, recent studies help us understand why courts have long recognized a defendant's youth to be such a crucial factor in the totality of the circumstances. In one study, for example,

> 44.8% of juveniles, as compared to 14.6% of adults, misunderstood their right to consult an attorney and have an attorney present during an interrogation. Juveniles were often confused as to the "time and place an attorney could be consulted, 'interrogation' often being misconstrued as an adjudication hearing." Additionally, 23.9% of juveniles, as compared to 8.5% of adults, misunderstood the statement that anything said during an interrogation could be used against them in court. Also, 61.8% of juveniles, as compared to 21.7% of adults, did not recognize that a judge could not penalize an individual for invoking their right to silence.

Hana M. Sahdev, Student Competition Winner, *Juvenile* Miranda *Waivers and Wrongful Convictions*, 20 U. PA. J. CONST. L. 1211, 1220 (2018) (footnotes omitted) (quoting and citing Thomas Grisso, *Juveniles' Capacities To Waive* Miranda *Rights: An Empirical Analysis*, 68 CALIF. L. REV. 1134, 1154 (1980)). These findings resonate with Luna's testimony that she did not know how to request an attorney, did not understand what it meant to have her statements used against her, and thought she had to do what the detective said.

The trial court relied primarily on the following facts to find that Luna understood her rights: she was read a verbal *Miranda* warning, asked no clarifying questions, said that she understood the warning, and answered the detective's questions; she was briefly checked by medical personnel who said she did not need further attention and could be interrogated; and she was provided some food, water, and access to the restroom. However, these facts reveal little more than the detective's compliance with the minimum requirements of *Miranda* and the duty to provide medical attention and sustenance to a person in police custody. *See Haley*, 332 U.S. at 601 ("[W]e cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them."). Considering Luna's testimony that she thought she had to do whatever the detective said, it can be inferred from

these same facts that she did not feel comfortable voicing her confusion or asking questions of him, an older man in a position of authority and control over her.

The detective was not constitutionally required to ask Luna more detailed comprehension questions, have her explain her rights to him in her own words, explain to her in greater detail what it means to have one's statements used against them in court or how to request a lawyer, or affirmatively provide her access to her mother or a lawyer. Still, his decision not to take any of these steps is part of the totality of the circumstances that must be considered. *Cf. State v. Leonard*, No. 46753-4-II, slip op. at 10 (Wash. Ct. App. Mar. 9, 2016) (unpublished) (finding waiver when detective asked defendant follow up questions such as "whether he understood that he could invoke any of the *Miranda* rights at any time and that he did not have to answer any questions asked of him"), https://www.courts.wa.gov/opinions/pdf/D2%2046753-4-II%20Unpublished%20Opinion.pdf; *State v. Villa*, No. 85627-8-I, slip op. at 11 (Wash. Ct. App. Feb. 10, 2025) (unpublished) (finding waiver when detective told defendant, "If you don't want to give me your side of the story, then you don't sign [the waiver form] and you leave" (alteration in original)), https://www.courts.wa.gov/opinions/pdf/856278.pdf; *cf. also State v. DeAngelo M.*, 2015-NMSC-033, 360 P.3d 1151, 1157-58 (describing steps detective may take to build record of juvenile's understanding of rights). The absence of any of these

measures leaves an insufficient factual basis to conclude that Luna, a 16 year old suffering recent head trauma with no prior experience as a target of police interrogation, had more than a surface level understanding of her rights.

While we give deference to the trial court's assessment of testimony and credibility, we must also meaningfully review the record and hold the State to its heavy burden of proving that a defendant knowingly, intelligently, and voluntarily waived their constitutional rights. Looking at the facts and reasonable inferences under the totality of the circumstances, we hold that substantial evidence does not support the finding that Luna had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421. Accordingly, we hold that admitting evidence of the interrogation violated Luna's right against self-incrimination and the evidence should have been excluded.[13]

---

[13] Luna and amici also argue that Luna's mother invoked Luna's right to counsel. While Luna pointed to her mother's statements to the responding officer as affecting the fairness of her interrogation, the State is correct that she did not raise an argument based on invocation of her rights until her second supplemental brief. Invocation of the right to counsel is distinct from waiver of that right. *See, e.g.*, *Thompkins*, 560 U.S. at 380-87 (analyzing invocation in section III.B and waiver in section III.C). Not only is the argument new, but the issue of whether a parent can invoke their child's right to counsel is one of first impression. The record is also insufficient to decide whether Luna's mother unequivocally invoked this right, as she did not testify at trial and the officer was not cross-examined about her statements. We therefore grant the State's motion to strike this argument.

We next turn to Luna's challenges to the exclusion and admission of social media evidence, starting with the "green light" image, continuing with the mall fight video, and concluding with the *Purge* video and "stabbing energy" comment.

III. The "green light" image was excluded under an erroneous foundation requirement and its exclusion violated Luna's right to present a defense because it was highly probative of Luna's fear and presented a low risk of confusion or prejudice

Luna argues that the trial court erroneously excluded the "green light" image under the rules of evidence and that the exclusion violated her right to present a defense. The state and federal constitutions guarantee a defendant the right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022); WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. We have interpreted these rights as coextensive. *See Jennings*, 199 Wn.2d at 63-67 (providing no independent state constitutional analysis). When considering a claimed violation of the right to present a defense, we first review the trial court's evidentiary rulings for abuse of discretion. *Id.* at 58 (citing *State v. Arndt*, 194 Wn.2d 784, 798-812, 453 P.3d 696 (2019)). Then, we review de novo whether the exclusion of evidence violated the defendant's right to present a defense. *Id.* A trial court abuses its discretion when its ruling is "'manifestly unreasonable or based on untenable grounds.'" *State v. Gunderson*, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014) (quoting *State v. Brown,* 132 Wn.2d 529, 572, 940 P.2d 546 (1997)). Untenable grounds include the misconstruction of an

evidence rule or "'an erroneous view of the law.'" *State v. Martinez*, 2 Wn.3d 675, 687, 541 P.3d 970 (2024) (quoting *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006)).

The trial court excluded the "green light" image on the basis of relevance, explaining that it lacked a sufficient foundation tying the image to S.P.T., and that the statements contained in the image were hearsay. 4 VRP at 1164. Foundation, also called authentication or identification, is a long-standing threshold requirement for the admissibility of all evidence. ER 901(a); *see also* John H. Langbein, *Historical Foundations of the Law of Evidence: A View from the Ryder Sources*, 96 COLUM. L. REV. 1168, 1194, 1181 (1996) (noting that premodern evidence law was "preoccupied" and "concerned almost entirely" with authenticity of evidence). While the jury remains the ultimate arbiter of whether evidence is truthful and authentic, the court must make a preliminary determination as to whether sufficient evidence would support a finding that the proffered evidence is what its proponent claims it to be. ER 901(a); ER 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . . .").

A defendant may offer relevant evidence of a pertinent character trait of a victim. ER 404(a)(2). Defendants often introduce this type of evidence in self-defense cases, because a defendant is entitled to "act on appearances" in assessing the danger posed by a victim. *State v. Miller*, 141 Wash. 104, 105, 250 P. 645 (1926).

The jury should evaluate a self-defense claim "in light of all the facts and circumstances known to the defendant, including those known substantially before the killing." *State v. Wanrow*, 88 Wn.2d 221, 234, 559 P.2d 548 (1977) (emphasis omitted).

Luna analogizes to a Court of Appeals case, *State v. Duarte Vela*, also involving self-defense. 200 Wn. App. 306, 402 P.3d 281 (2017). There, the defendant's brother would have testified that he spoke to the victim on the phone two or three years earlier when the victim was in prison and that the victim threatened to kill the defendant and his family. *Id.* at 313. The brother would also testify that he told the defendant about this threat. *Id.* The defendant proffered this evidence to show his state of mind and reasonable fear of the victim, while the State argued it was too remote in time, not relevant, and hearsay not subject to an exception. *Id.* The trial court excluded the testimony, mostly because it was too remote in time to the alleged crime, and also suggested "'foundational questions'" would be needed to establish when the phone call took place. *Id.* at 314 (quoting the trial record).

The Court of Appeals reversed, concluding that the trial court erred and the exclusion violated the defendant's right to present a defense. *Id.* at 326-27. It explained that the threat was not hearsay because it was proffered for its effect on the defendant's state of mind, that it was highly probative on that point, that it was

not too remote in time, and that it was not improper character evidence or speculative. *Id.* at 318-26.

The analysis of foundation and relevance necessarily looks different for evidence a defendant proffers to show their subjective fear of a victim, in contrast to evidence proffered to establish objective facts and events. Here, just like the threat in *Duarte Vela*, Luna was not seeking to admit the "green light" image for the truth of the statements contained within it, i.e., that S.P.T. in fact threatened her with gang violence. Luna sought to admit the image for its effect on her state of mind, a nonhearsay purpose. Also like in *Duarte Vela*, the threat here was communicated to Luna via a third party. Although in this case that third party was not available to testify, Luna's testimony that she was sent the image prior to the fight with S.P.T. and that she believed it showed S.P.T. making a threat toward her "made the evidence tendered relevant and material" to her self-defense claim. *State v. Ellis*, 30 Wash. 369, 373, 70 P. 963 (1902).

It is true that Luna could not identify the person who sent her the image and that the image showed multiple layers of people screenshotting and reposting, making it difficult to attribute the text in the image to any one person. This may be a common feature of social media evidence, and it is not dispositive here. Luna's testimony provided sufficient evidence to find that she honestly believed the image to be a threat made by S.P.T. and that she saw the image before the fight, which is

the only foundation necessary to admit it for its effect on her state of mind. It was her right "to have [her] testimony weighed and passed upon by the jury." *State v. Cushing*, 14 Wash. 527, 532, 45 P. 145 (1896). We hold that the trial court abused its discretion by excluding the "green light" image based on a foundation requirement inapplicable to the type of evidence and purpose for which Luna sought to admit it.[14]

We review claimed violations of the right to present a defense de novo under a balancing test. "If the evidence is relevant, the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence . . . ." *Jennings*, 199 Wn.2d at 63 (citing *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)). If the evidence is of minimal relevance, it may be excluded if the State's interest in excluding it is compelling in nature. *Hudlow*, 99 Wn.2d at 16. For evidence with a high probative value, "it appears no state interest can be compelling enough" to exclude it without violating the defendant's right to present a defense. *Id.* This often happens when the excluded

---

[14] Luna also challenges the exclusion of the screenshot from Urban Dictionary defining the term "green light." The relevance of this exhibit was contingent on admitting the "green light" image because there were no other references to the term "green light" in evidence or testimony. Based on the trial court's exclusion of the "green light" image, it properly excluded the Urban Dictionary screenshot as irrelevant, and we hold that this was not an abuse of discretion. The admissibility of the Urban Dictionary screenshot may be addressed anew by the trial court in the event of a retrial.

evidence forms the defendant's "entire defense." *Arndt*, 194 Wn.2d at 814 (emphasis omitted) (citing *State v. Jones*, 168 Wn.2d 713, 724, 230 P.3d 576 (2010)).

Here, the "green light" image was not Luna's entire defense, but it was the single most probative piece of evidence offered to show her reasonable fear of S.P.T. If believed, this evidence would show the jury that S.P.T. had put out a "hit" on Luna. It is true that Luna was able to testify about her fear and about several of S.P.T.'s social media posts that were admitted. *See* 4 VRP at 1167-91. Those posts suggested that S.P.T. was generally the type of person who would get in a fight, especially to protect or avenge someone like H.D., who viewed her as a big sister. *See, e.g.*, Exs. 161F, 161I. But the only piece of evidence that Luna believed showed a specific threat of violence directed at her was the "green light" image. Excluding this evidence effectively prevented Luna from explaining to the jury not only the true extent of her fear but why that fear was reasonable. After seeing the "green light" image, the jury would still be entitled to reject Luna's claim of self-defense, for example, if they found her testimony not credible or if they did not think that her use of force was objectively reasonable. But the jury was also "entitled to stand as nearly as practicable in the shoes" of Luna to assess her self-defense claim, and Luna had a right to present evidence to the jury that would allow them to do that. *Ellis*, 30 Wash. at 373.

The State does not assert any compelling interest in excluding the "green light" image. Instead, it relies on the foundation rationale affirmed by the trial court and the Court of Appeals. We assume the State's interests include those addressed by ER 403 and 404(b): preventing the jury from being confused by evidence that represents social media trends or jokes rather than genuine threats or aggression, and preventing a trial within a trial about S.P.T.'s character. Unlike some of the other social media evidence, the "green light" image does not itself contain any indications of joking or participation in a trend. If the jury believed Luna that she thought the "green light" image contained a genuine threat of coordinated group violence from S.P.T., it is hard to see how they could be confused about the effect of the image on Luna's state of mind during the fight. Like the other social media evidence that was admitted, the "green light" image could have been admitted with a limiting instruction that it be considered only for Luna's state of mind, not for the truth of the matter described in the image. *See, e.g.*, 4 VRP at 1181. Given this lesser concern for confusion or prejudice, the State's interest in excluding the "green light" image is not compelling. We hold that excluding this highly probative piece of evidence violated Luna's right to present a defense.[15]

---

[15] We decline to address Luna's challenges to the other excluded exhibits of S.P.T.'s social media posts, and her challenge to the exclusion of S.P.T.'s toxicology report.

We next address Luna's challenges to the social media evidence introduced by the State, starting with the evidence of the mall fight between her and H.D.

## IV. The mall fight video was improperly admitted under an erroneous application of res gestae

Luna challenges the evidence of her mall fight with H.D. as improper character evidence and argues that the res gestae exception should not apply. The State argues that she did not preserve a challenge to testimony about the mall fight or to the mall fight video. We first address whether and to what extent Luna preserved this challenge.

## A. Luna preserved a challenge to admission of the mall fight video but not to testimony about the mall fight

The State's offer of proof accompanying its pretrial motion to admit evidence specifically referenced the video of the mall fight that Luna posted on TikTok. CP at 36-37. It did not mention testimony about the mall fight or testimony about the fact that Luna created the video and shared it with friends on the day of the fight. Luna opposed this motion. *Id.* at 71-82. Although she did not specifically reference her video of the mall fight, her arguments and cited case law discuss character evidence and ER 404(b) generally. These arguments were relevant to each piece of evidence in the State's offer of proof, which the State acknowledged were all evidence of other bad acts and thus inadmissible unless offered for a purpose other than to show that Luna acted in conformity with them. The Court of Appeals

determined that Luna had not preserved a challenge to the mall fight video because she failed to specifically mention it in her written opposition to the State's motion. *Luna*, slip op. at 12.

Luna's specific arguments about the prejudicial qualities of the video have become more refined on appeal, but her written opposition to the motion discussed prejudice. CP at 74, 77, 80. We conclude that Luna's written opposition to the State's motion was sufficient to preserve a challenge to the mall fight video. Because the motion was granted in the State's favor and the trial court did not indicate that further objections at trial would be needed to preserve the issue for appeal, Luna's opposition to the motion is deemed a standing objection and was sufficient to preserve the issue without further objection during trial. *See State v. Finch*, 137 Wn.2d 792, 819-20, 975 P.2d 967 (1999) (plurality opinion).

Still, we must distinguish admission of the video from testimony about the mall fight. Luna did not raise an ER 404(b) objection to any testimony at trial about the mall fight, the video of it, the fact that she and her friends reshared the video on the day of the fight with S.P.T., or the fact that the mall fight formed part of the impetus for S.P.T. to fight her. *See, e.g.*, 2 VRP at 446-57; 4 VRP at 1366-71. Luna argues that the trial court's decision to admit the video pretrial necessarily admitted testimony about the fight, so any objection to this testimony was encompassed in her pretrial objection and did not need to be renewed at trial. However, at the pretrial

motion hearing, Luna conceded that the State could elicit testimony about the mall fight from H.D., arguing that such testimony would make the video of the fight cumulative. VRP (Sept. 19, 2022) at 38. In light of this concession, and the lack of objection at trial, we hold that Luna did not preserve a challenge to testimony about the mall fight or the existence of the video, only a challenge to the admission of the video itself.

B. The trial court abused its discretion in admitting the mall fight video because the events were too remote in time and unrelated to Luna's state of mind for the res gestae exception to apply

Evidence of a defendant's other bad acts is not admissible to prove their character and that they acted in conformity with that character. ER 404(b). However, it may be admissible for another purpose, such as a motive, plan, or intent to commit the crime at issue. *Id.* Although not enumerated in ER 404(b), one purpose for which prior bad acts evidence may be admissible is the doctrine of res gestae, which has common law roots going back to at least the early 19th century, predating the codification of evidence rules. *See* H. Patrick Furman & Ann England, *The Expanding Use of the* Res Gestae *Doctrine*, 38 COLO. L. 35 (2009), https://scholar.law.colorado.edu/cgi/viewcontent.cgi?article=1248&context=faculty-articles. Also known as the "same transaction" exception, this doctrine allows admission of evidence of other crimes or misconduct to "complete the story of the crime by establishing the immediate time and place of its occurrence." *Brown*, 132

Wn.2d at 570-71 (1997) (citing *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995)).

The State argued that the mall fight video should be admitted under the res gestae exception because it completed the story for the jury and explained "why S.P.T. ever arrived at [Luna]'s house or why a fight was even occurring." CP at 63; *see also* VRP (Sept. 19, 2022) at 37-38. Unlike the other bad acts evidence in its motion, the State did not argue that the mall fight video was admissible for the purpose of proving motive, plan, or intent. Accordingly, the trial court admitted the mall fight video only under the res gestae exception. VRP (Sept. 19, 2022) at 41. In doing so, the trial court appeared to believe that the mall fight video was created and posted on TikTok by Luna close in time to the fight with S.P.T., rather than shortly after the mall fight itself. The court also noted the evidence that Luna and her friends reshared the mall fight video just before the fight with S.P.T.

Luna argues that the res gestae exception cannot apply to the mall fight because it occurred months before the fight with S.P.T. and is too remote in time. The State counters that remoteness does not matter and relies on a recent Court of Appeals opinion to argue that there are two "alternative bases for admitting res gestae evidence": either the evidence "'completes the story of the crime charged *or* provides immediate context for events close in both time and place to that crime.'" Answer to Pet. for Rev. at 18-19 (quoting *State v. Sullivan*, 18 Wn. App. 2d 225,

237, 491 P.3d 176 (2021)).  To the extent that the Court of Appeals intended to describe two alternative res gestae exceptions, rather than describe a singular exception in two ways, that distinction is not found in our precedent.[16]  Our cases describe a single res gestae exception and, though not dispositive, they typically involve evidence of acts committed on the same day of the crime at issue or, at most, within a few days of the crime.  *See, e.g.*, *Lane*, 125 Wn.2d at 833 (admitting evidence about two or three day period surrounding crime); *Brown*, 132 Wn.2d at 546-48, 575 (admitting evidence of similar crime two days after crime at issue); *State v. Tharp*, 96 Wn.2d 591, 592, 637 P.2d 961 (1981) (admitting evidence of multiple

---

[16] A handful of Court of Appeals cases cite *Sullivan* for its description of res gestae, but none explicitly read *Sullivan* as creating two alternative res gestae exceptions and most are consistent with our precedent of applying res gestae as to bad acts that are close in time to the charged crime. *See State v. Singh*, No. 39703-3-III, slip op. at 3 (Wash. Ct. App. Nov. 21, 2024) (unpublished) (admitting evidence of uncharged assault "around the same time" as charged assault); *State v. Martinez*, No. 84824-1-I, slip op. at 3, 8-11 (Wash. Ct. App. Dec. 9, 2024) (unpublished) (admitting evidence of maltreated horse seen by animal control officer at the same time as maltreated horse for which defendant was charged); *State v. Pine-Nelson*, No. 85494-1-I, slip op. at 1, 10 (Wash. Ct. App. June 24, 2024) (unpublished) (admitting testimony about uncharged assault from same afternoon as charged assault), *review denied*, 3 Wn.3d 1030 (2024); *State v. Purdy*, No. 81106-1-I, slip op. at 1, 11-13 (Wash. Ct. App. Oct. 4, 2021) (unpublished) (admitting testimony about defendant being belligerent toward bar bouncer a few minutes before assault); *State v. Bauer*, No. 86608-7-I, slip op. at 10-12 (Wash. Ct. App. Dec. 16, 2024) (unpublished) (excluding evidence of potential drug deal three weeks prior to murder at issue), *review denied*, 4 Wn.3d 1033 (2025). *But see State v. Maeurer*, No. 81557-1-I, slip op. at 1, 3 (Wash. Ct. App. Nov. 15, 2021) (unpublished) (admitting under res gestae and lustful disposition doctrine testimony of comments defendant made to victim about her body "frequently" at unspecified times); *State v. Arumugam*, 30 Wn. App. 2d 411, 545 P.3d 363 (2024), *review denied*, 3 Wn.3d 1023 (2024) (admitting under res gestae defendant's 2018 arrest for child pornography to explain timing of child victims' decisions to report crimes, including one that occurred in 2016).

uncharged crimes from the evening of one day through the morning of the next).[17]

The evidence must also establish the "immediate time and place" of the crime at

issue and form a "'link in the chain' of an unbroken sequence of events surrounding

the charged offense." *Brown*, 132 Wn.2d at 571 (quoting *Tharp*, 96 Wn.2d at 594,

and citing *Lane*, 125 Wn.2d at 831). Here, the mall fight was six months before the

fight with S.P.T. and took place at a completely different location.

Moreover, our cases describe res gestae as completing the story of the

*defendant's* actions, not the victim's. The State's res gestae argument relied on

providing context to the jury for why S.P.T. wanted to fight Luna, not context for

Luna's actions or state of mind. While the jury may have wanted to know that

context, their primary role involved assessing Luna's state of mind on the day in

question. Luna testified that she did not know why S.P.T. came to her house that

day or even that it would be S.P.T. coming instead of H.D. Thus, S.P.T.'s

motivations for coming could not be relevant to Luna's state of mind. Although

nothing we have said about the res gestae doctrine precludes its application to a

---

[17] Our most recent case to reference res gestae involves prior uncharged sexual abuse spanning roughly a year leading up to the charged crime. *State v. Crossguns*, 199 Wn.2d 282, 286-87, 505 P.3d 529 (2022). However, the primary holding of the case was to abolish the "lustful disposition" doctrine as an exception to ER 404(b). Our only references to res gestae were in a long list of other purposes for which the evidence might have properly been admitted, leading to the conclusion that any error in applying the lustful disposition doctrine was harmless. *Id.* at 287, 296. We did not identify which specific purposes applied to the evidence at issue, and this case should not be considered to have announced a holding expanding the scope of the res gestae doctrine.

victim's actions, that logic does not support the admission of the mall fight video here.

To the extent that the trial court's ruling is based on the fact that Luna and her friends reshared the mall fight video before the fight with S.P.T., that is also an improper application of the res gestae exception. Res gestae is an exception to the prohibition on evidence of other bad acts, and the bad act in question is the mall fight itself, not resharing the video of it. The mall fight occurred months before the fight with S.P.T., and resharing the video of it did not make it part of the same transaction as the fight with S.P.T. Luna resharing the video shortly before the fight may have made the mall fight relevant to a different exception to ER 404(b), but the State did not make this argument in its motion, and the trial court did not admit the video on any basis other than res gestae. If there exists a plausible argument that a different ER 404(b) exception applies, that argument can be made and appropriately addressed by the trial court in the event of a retrial.[18]

---

[18] The State also cites *State v. Elmore*, 139 Wn.2d 250, 286, 985 P.2d 289 (1999), in its statement of additional authorities. In *Elmore*, the defendant admitted he killed the victim because she threatened to disclose that he had molested her around a decade earlier. We approved of the admission of the defendant's statements as res gestae of the homicide at issue, but they are more properly understood as evidence of his motive, a distinct exception under ER 404(b). *Elmore* is also distinguishable because the challenged evidence was the defendant's own statements, and they were used in the sentencing phase of a capital case after he pleaded guilty, not admitted during the guilt phase of a trial.

Luna moves to strike the State's statement of additional authorities, relying on the following view expressed by the Court of Appeals about the purpose of RAP 10.8: "We view this rule as being intended to provide parties an opportunity to cite authority decided after the completion of briefing. We do not view it as being intended to permit parties to submit to the court

The State also cites *Sullivan* for the proposition that the res gestae doctrine

"'more appropriately falls within ER 401's definition of relevant evidence . . . rather

than an exception to propensity evidence under ER 404(b).'" 18 Wn. App. 2d at 236

(internal quotation marks omitted) (quoting *State v. Dillon*, 12 Wn. App. 2d 133,

148, 456 P.3d 1199 (2020)); *see also id.* at 237 ("[Res gestae evidence] is not subject

to the requirements of ER 404(b). Such evidence is not of *other* misconduct of the

type addressed in ER 404(b)." (citing *State v. Grier*, 168 Wn. App. 635, 647, 278

P.3d 225 (2012))).

ER 401 and 404(b) are not mutually exclusive. ER 404(b) plainly addresses

all evidence of a person's "other crimes, wrongs, or acts," whether criminal or not,

close or far in time, and before or after the charged crimes. *See Brown*, 132 Wn.2d

at 576. ER 404(b) states that such evidence is not admissible to prove a person's

---

cases that they failed to timely identify when preparing their briefs." *O'Neill v. City of Shoreline*, 183 Wn. App. 15, 23, 332 P.3d 1099 (2014).

Parties often file statements of additional authorities that bring to our attention relevant new opinions that have been published since our grant of review in a case, but nothing in the text of RAP 10.8 limits its application to that type of authority. The rule merely requires that the additional authorities "relate to a point made in the briefing or at oral argument" and that the statements explain "the reasons for the additional authorities." RAP 10.8(a)-(b). We interpret the rules "liberally . . . to promote justice and facilitate the decision of cases on the merits." RAP 1.2(a). We recognize that initial research does not always reveal every pertinent case on a topic. Generally, the interests of justice will be promoted by considering every relevant case, even if it is brought to our attention later than would be ideal. The statement here was filed before oral argument and it explained *Elmore*'s purported relevance to the State's res gestae argument. Luna had the opportunity to respond to the argument based on *Elmore* before oral argument and did so. We therefore deny Luna's motion to strike.

character and that they acted in conformity with such character. This is a recognition that bad acts may be relevant to a person's character, but the very nature of using a person's propensity for bad acts to prove they committed a specific bad act is so prejudicial as to be inappropriate in every case. Evidence of other bad acts remains admissible for other purposes, including res gestae, motive, and intent, so long as it is relevant to the purpose for which it is proffered. As discussed above, we have never found evidence of acts from months prior to be relevant to completing the story of the crime at issue. We have continuously described res gestae as a potential exception to ER 404(b)'s ban on evidence of other bad acts. *See State v. Crossguns*, 199 Wn.2d 282, 296, 505 P.3d 529 (2022); *Brown*, 132 Wn.2d at 576; *Lane*, 125 Wn.2d at 831. *Sullivan*, *Dillon*, and *Grier* are all correct that if res gestae properly applies, ER 404(b) does not bar admission of bad acts evidence. But it is incorrect to say that this removes such evidence from the ambit of ER 404(b) in the first place. We disapprove these Court of Appeals cases to the extent that they separate res gestae from consideration of ER 404(b). If the evidence is of a bad act, a proper determination of admissibility requires considering both ER 404(b) and the exception that the proponent claims applies. We hold that the trial court here abused

its discretion by applying the State's erroneous interpretation of the res gestae exception to admit the mall fight video.[19]

Having concluded that the trial court erroneously admitted some evidence and erroneously excluded other evidence, we must consider the State's argument that these evidentiary errors are harmless in the context of all of the evidence at trial. In addressing this argument, we must also consider the *Purge* video and the "stabbing energy" comment, which the Court of Appeals held, and the State does not dispute, were erroneously admitted.

V. The errors are not harmless because they prejudiced Luna's ability to have the jury assess her intent and her claim of self-defense from her point of view

"An error in a trial is not grounds for reversal unless the error was prejudicial to the defendant." *State v. Grenning*, 169 Wn.2d 47, 57, 234 P.3d 169 (2010) (citing *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)). If the error is of

---

[19] Luna also argues that admitting the video without redacting the rap music that she added to it on TikTok was unduly prejudicial under ER 403. We have not yet addressed prejudice related to rap lyrics, but other jurisdictions and our Court of Appeals have dealt with cases involving the admissibility of the defendant's own rap lyrics. *See In re Pers. Restraint of Quintero*, 29 Wn. App. 2d 254, 292-99, 541 P.3d 1007, *review denied*, 3 Wn.3d 1018 (2024). Given the limited arguments here, we decline to reach this issue of first impression.

Lastly, Luna argues the video was cumulative with testimony about the mall fight. We have repeatedly said that "the admissibility of cumulative evidence lies within the trial court's discretion." *Christensen v. Munsen*, 123 Wn.2d 234, 241, 867 P.2d 626 (1994) (citing *Mullin v. Builders Dev. & Fin. Serv., Inc.*, 62 Wn.2d 202, 206, 381 P.2d 970 (1963); *Sons of Norway v. Boomer*, 10 Wn. App. 618, 620-21, 519 P.2d 28 (1974)). The mall fight video might be cumulative with testimony about the mall fight, but in light of the great deference we owe to trial courts for admitting cumulative evidence, we do not find that the trial court abused its discretion on this basis.

constitutional magnitude, the State bears the burden of showing that it is harmless beyond a reasonable doubt. *Id.* at 58. A constitutional error is harmless if "any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). We consider both how the error tainted other evidence and whether the untainted evidence "is so overwhelming that it necessarily leads to a finding of guilt." *Id.* at 426 (citing *Parker v. Randolph*, 442 U.S. 62, 70-71, 99 S. Ct. 2132, 60 L. Ed. 2d 713 (1979); *Brown v. United States*, 411 U.S. 223, 231, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973)). At the end of the analysis, we will reverse "where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict." *Id.* Because we hold that trial errors here violated Luna's right against self-incrimination and her right to present a defense, we apply the constitutional harmless error test.

With respect to the *Purge* video and the "stabbing energy" comment, the Court of Appeals held that "in light of significant evidence introduced by the State showing that Luna did not use reasonable force during her fight with SPT, it is not reasonably likely that the admission of this evidence materially affected the jury's verdict." *Luna*, slip op. at 18. The court later stated that the evidence disproving self-defense "was substantial, if not overwhelming." *Id.* at 38. In reaching this conclusion, the court focused on the actions that Luna could have taken to prevent ending up in a fight with S.P.T. in the first place. *See id.* at 18-19, 38. It is true that

the jury could infer from these actions not taken that Luna was "eager for a fight." *See id.* at 38. However, the ultimate question for self-defense is not whether Luna could have prevented the need to use force in the first place, but whether, once S.P.T. threw the first punch at her, her responding force was reasonable. *See* RCW 9A.16.110 (defining self-defense); CP at 469-72 (instructing jury on self-defense and related terms).

The State highlights the fact that Luna was acquitted of premeditated murder and convicted of only second degree murder, implying that the jury believed Luna formed the intent to kill S.P.T. spontaneously during the fight. The State argues that the *Purge* video and the "stabbing energy" comment were relevant only to premeditation, not spontaneous intent, and thus this evidence could not have been necessary to reach a guilty verdict on second degree murder. The concepts of premeditated and spontaneous intent are not so neatly separated, though, and the State's own closing argument blended the two.

For example, the State argued at different times that Luna formed premeditated intent over several months, over the morning before the fight, or just over the course of the fight itself. The State also argued that Luna "broadcast[ed] her] intent to stab someone for months before actually stabbing someone," that she "was fixated on stabbing someone, and she finally had her opportunity to carry out that intent when [S.P.T.] arrived at her yard," and that she "had been nurturing an

59

intent to stab someone for some time, for months." 5 VRP at 1647-48, 1650. Based on the State's use of "someone," the jury was led to believe that Luna had a latent desire to stab *someone* but did not have a particular plan or target in mind until the day of the fight. Under the State's theory, this desire did not ripen into present intent to kill until Luna agreed to fight H.D., and the object of this intent did not become S.P.T. until S.P.T. showed up at Luna's house. *See* 5 VRP at 1746 ("[F]rom the moment [Luna] sent her address to [H.D.], she had made up her mind."); 2 VRP at 196 ("[I]t didn't really matter to [Luna] that it was [S.P.T.] and not [H.D.] that showed up."). Under this theory, even though the jury did not find premeditation, the *Purge* video and the "stabbing energy" comment are relevant to that latent desire. It is impossible to cabin their relevance *only* to premeditation.

The State relied heavily on this evidence, especially the *Purge* video, which it described as the "most shocking[]" of the character evidence it introduced. 5 VRP at 1649. No other evidence gave the jury any indication that Luna fixated on specifically stabbing as a mode of inflicting violence. Without this evidence, the jury could have been more likely to believe Luna's testimony that she routinely carries her pocketknife for protection every time she leaves her house. If Luna had been allowed to testify about the "green light" image, the jury also could have been more likely to believe that her intent in using the knife, at least as the fight started, was self-protection. The jury could still have rejected Luna's self-defense argument

60

and found that her repeated use of the knife was an unreasonable use of force, or that it was criminal negligence, supporting the lesser included charge of manslaughter in the second degree. But, there would be significantly less evidence going toward Luna's intent to kill, giving rise to a reasonable probability that the jury could have acquitted Luna of the second degree intentional murder charge.

The State also relied heavily on the evidence of the interrogation to prove intent. The State not only called the interrogating detective to testify but also played the interrogation video for the jury, allowing them to assess firsthand Luna's demeanor throughout the interrogation. In its closing argument, the State described Luna's demeanor as "'flippant'" and "carefree," and emphasized her seemingly inconsistent stories in the interrogation. 5 VRP at 1661. It is fair to say the interrogation was the key piece of evidence supporting the State's narrative that Luna was a calculated killer who had been waiting for the opportunity to stab someone, showed no remorse or shock after having done so, and deliberately constructed her story to fit a claim of self-defense.

Amici highlight the ways that youth, gender, and race intersect to compound the prejudicial effects of these erroneous rulings. For example, research shows that young girls are punished more harshly in the criminal justice system when they act inconsistent with societal expectations based on gender and race. *See* Jyoti Nanda, *Blind Discretion: Girls of Color & Delinquency in the Juvenile Justice System*, 59

UCLA L. REV. 1502, 1529-31 (2012). Luna's participation in a TikTok trend and joking comment on Instagram were offered and could be taken as serious evidence of her plan to murder someone; whereas for a young person of a different demographic they are more likely viewed as lighthearted jokes. The shock value of the evidence as counter to common narratives about girls could also have made the jury reluctant to believe Luna's testimony that she carried her pocketknife on her for self-protection any time she left her house. Luna's demeanor in the interrogation was described as "unsettling and certainly unusual" rather than an expected response to the detective's own casual demeanor in questioning. 5 VRP at 1662. Likewise, inconsistencies in her version of events during the interrogation were offered as evidence that she deliberately crafted a narrative of self-defense. This research may also explain the misfocus by the State and the Court of Appeals on the actions Luna could have taken to avoid a fight or to ask her dad, brother, or boyfriend for help. *See* 4 VRP at 1374-75. Each of these facts reflects a departure from the societal expectations that young girls take no interest in violent media, participate only in lighthearted trends, avoid confrontation and arming themselves, rely on men for protection, and show a vulnerable emotional response after traumatic events.

This research also intersects with the concept of adultification, a cognitive bias in which youth of color are perceived as more mature, and punished more harshly for the same conduct, than their white counterparts. *See In re Pers. Restraint*

*of Miller*, 21 Wn. App. 2d 257, 265, 505 P.3d 585 (2022); *see also* Jessica Levin, *A Path Toward Race-Conscious Standards for Youth: Translating Adultification Bias Theory into Doctrinal Interventions in Criminal Court*, 35 UC L. SF J. ON GENDER & JUST. 83 (2024). Scholars credit adultification, and its specific manifestation through the "superpredator" myth, as the impetus for states expanding the circumstances under which juveniles are subject to trial in adult court with adult sentencing outcomes. *See The Superpredator Myth, 25 Years Later*, EQUAL JUST. INITIATIVE (Apr. 7, 2014), https://eji.org/news/superpredator-myth-20-years-later/.

Considering the prejudicial effect these errors had on the jury's assessment of Luna's intent and her claim of self-defense, we cannot conclude beyond a reasonable doubt that the trial errors at issue here were harmless.

CONCLUSION

RCW 13.40.740 governs the conduct of juvenile interrogations taking place after its effective date and therefore does not apply to exclude evidence from Luna's interrogation. However, the evidence should have been excluded because the detective's verbal *Miranda* warning and brief colloquy with Luna was insufficient to show that she understood her rights to silence and counsel well enough to waive them. In addition, the trial court's erroneous interpretation of the res gestae doctrine and the foundation requirement resulted in the admission of evidence that was highly prejudicial to Luna and the exclusion of evidence central to her arguments regarding

intent and self-defense.  These errors violated Luna's constitutional rights and were not harmless beyond a reasonable doubt.  We therefore vacate the jury verdict and remand for further proceedings consistent with this opinion.

_____
Stephens, C.J.

WE CONCUR:

_____
Johnson, J.

_____
Madsen, J.

_____

_____
Yu, J.

_____
Whitener, J.

_____

No. 103251-0

GONZÁLEZ, J. (concurring)—I agree with the court on most of its holdings in this case. Lola Luna's right to counsel was violated, and the trial court's erroneous evidentiary rulings deprived her of the ability to present her defense. I write separately, however, because I disagree with the majority's description of our case law regarding the retroactive scope of remedial statutes and with its characterization of our res gestae doctrine, and to make other observations.

I. The Retroactive Scope of Remedial Statutes

Our role when interpreting statutes is to carry out the intent of the legislature. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002) (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). When that intent is not clear, we resort to rules of statutory construction and prior case law examining similar legislative gaps or ambiguities. *Id.* at 10. We have an extensive, but not entirely consistent, body of case law regarding retroactivity. That said, one overarching theme has remained consistent through the decades: the legislature's power is plenary and, as such, the legislature can enact retroactively operating remedial statutes so long as its intent to do so is clear and so long as it

does not impair existing contractual obligations, deprive vested rights, or violate the constitution.

The majority's reasoning suggests our case law in this area is not so deferential to the legislature. It summarizes our precedent to mean that "[i]n the context of retroactivity, the exception for remedial statutes refers to statutes that prescribe a new or different remedy for a *preexisting* right, not those that grant a new right (or establish a new liability) with an accompanying remedy." Majority at 22. I disagree because our case law regarding the retroactive effect of remedial statutes has not been exclusively concerned with the creation of new or different remedies for preexisting rights. Instead, I read our case law to be almost solely concerned with what the legislature has said and with whether constitutional or other common law inhibitions require that we invalidate the retroactivity intended by the legislature.

Historically, this court has used the words "curative . . . [and] . . . remedial . . . interchangeably." *Frederick v. City of Seattle*, 13 Wash. 428, 433, 43 P. 364 (1896). In *Frederick* we explained that the legislature is free to enact retroactive statutes under its taxing power. *Id.* at 433-34. *Frederick*, like many other cases, found retroactivity even when the legislation did not merely create a new or different remedy for a preexisting right.

In the cases that followed *Frederick*, we began to look for explicit legislative intent to resolve the issue of retroactivity. For example, in *Rogers v. Trumbull* we explained that "[r]etroactive statutes are generally regarded with disfavor. Those not remedial will not be construed to operate retrospectively *unless the intent that they shall do so is plainly expressed*." 32 Wash. 211, 212, 73 P. 381 (1903) (emphasis added). The cases that followed *Rogers* often conflict with the majority's new rule. One of the oldest of such cases, *State ex rel. Bussell v. Abraham*, used the term "curative" instead of "remedial," and explained in clear terms that the legislature's broad power to enact retroactive statutes is curbed by preexisting contractual obligations and constitutional guaranties: "The legislature has power to enact a curative or validating statute retroactive in its application, as long as it does not thereby impair the obligation of contract or otherwise violate any constitutional inhibition." 64 Wash. 621, 626, 117 P. 501 (1911); *see also Rood v. Water Dist. No. 24*, 183 Wash. 258, 266-67, 48 P.2d 584 (1935) (quoting *Bussell*, 64 Wash. at 626); *McKenzie v. Mukilteo Water Dist.*, 4 Wn.2d 103, 111, 102 P.2d 251 (1940) (quoting *Bussell*, 64 Wash. at 626).

In the cases that followed *Bussell* we focused more on the common law limitations on the legislature's power to enact retroactive statutes. At the time, we generally required the legislature to make its intent clear. *Nelson v. Dep't of Lab. & Indus.*, 9 Wn.2d 621, 627, 115 P.2d 1014 (1941) ("It is the general rule that

3

statutes have no retroactive effect unless the legislative intent is so expressed therein."). "The exception is that an act has a retroactive application when it relates to practice, procedure, or remedies, and does not affect a contractual or vested right." *Id.*

That said, *Frederick*, *Rogers*, *Bussell*, and *Nelson* are not the only cases that take a different approach than the majority does today. *See, e.g.*, *Layton v. Home Indem. Co.*, 9 Wn.2d 25, 34, 113 P.2d 538, 541 (1941) ("statutes will be construed to be effective *in futuro* only, unless a contrary intent clearly appears"); *Pierce v. Pierce*, 107 Wash. 125, 135, 181 P. 24 (1919) (Chadwick, C.J., dissenting) ("Remedial statutes, although retrospective, are not regarded as obnoxious *per se.*"); *Brown Bros. v. Columbia Irrig. Dist.*, 82 Wash. 274, 284, 144 P. 74 (1914) ("the rule governing the interpretation of remedial statutes is to find the object of the legislature and to enforce it if it can be done without violence to any mandate of the constitution"); *Cudihee v. Phelps*, 76 Wash. 314, 332, 136 P. 367 (1913) ("We think this statute should be construed as to its retroactive effect like any ordinary remedial statute. It is manifestly for the purpose of making effective the exercise of a right which was in existence before its passage."); *see also Godfrey v. State*, 84 Wn.2d 959, 961, 530 P.2d 630 (1975) (discussing vested rights as a limit on retroactive legislation); *Anderson v. City of Seattle*, 78 Wn.2d 201, 202, 471 P.2d 87 (1970) (discussing legislative intent with regards to retroactivity).

My review of these cases convinces me that this court does not decide when laws are retroactive, the legislature does. *See also, e.g.*, *Kellogg v. Nat'l R.R. Passenger Corp.*, 199 Wn.2d 205, 225-26, 504 P.3d 796 (2022) (holding the legislature expressly intended the amendment to the wrongful death beneficiary statute to apply retroactively to claims that are not time barred). Our job here is to restrain the legislature if it has overstepped its constitutional authority and to check whether its intent is clear. That is all. By holding that a remedial statute is only retroactive when it establishes a new or different remedy to a preexisting right, the majority goes too far and overturns a number of cases without saying so out loud.

## II. Our Res Gestae Doctrine

The majority suggests that the res gestae exception is typically limited to evidence of acts committed on or near the same day of the crime at issue. Majority at 53. The majority is correct that recency may be relevant, but it is not dispositive. Instead, recency is one of the factors relevant to whether hearsay evidence is subject to the res gestae exception.

As early as 1886, in *Vicksburg & Meridian*, the United States Supreme Court explained that res gestae is not a strict exception bound by proximity in time but, instead, an elastic doctrine that encompasses statements that were not recent to the underlying event. *See Vicksburg & Meridian R.R. Co. v. O'Brien*, 119 U.S. 99, 108, 7 S. Ct. 118, 30 L. Ed. 299 (1886) ("The modern doctrine has relaxed the

5

ancient rule that declarations, to be admissible as part of the *res gestae*, must be strictly contemporaneous with the main transaction."). In *Vicksburg & Meridian*, the Court explained that recency is simply not dispositive for the admissibility of res gestae evidence. "What time may elapse between the happening of the event in respect to which the declaration is made, and the time of the declaration, and yet the declaration be admissible, *must depend upon the character of the transaction itself.*" *Id.* (emphasis added); *see also Cook v. Stimson Mill Co.*, 36 Wash. 36, 39, 78 P. 39 (1904) (citing *Vicksburg & Meridian*, 119 U.S. 99) (holding that a statement made a day after an accident did not satisfy res gestae because the speaker was not at the scene of the accident when the statement was made). To me, *Vicksburg & Meridian* is clear: recency is not dispositive in the application of the res gestae hearsay exception. *See also White v. Illinois*, 502 U.S. 346, 356, 112 S. Ct. 736, 743, 116 L. Ed. 2d 848 (1992) (focusing on reliability and not recency when evaluating hearsay testimony).

Further, this court's precedent is even more apt than *O'Brien*. Since 1939 this court has relied on its own standard, which we have not dusted clean with proper application in over a decade. In *Beck v. Dye*, we took "the pains to examine the cases on the subject" and ultimately created a six-part test to govern application of res gestae. 200 Wash. 1, 9-10, 92 P.2d 1113 (1939). That rule contemplates the

admissibility of statements that are not coincident or contemporaneous with the

underlying event:

> (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact, and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation, and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

*Id.*

We consistently stuck to this approach in the 70 years that followed *Beck*.

*See State v. Daba*, 75 Wn.2d 234, 236, 450 P.2d 183 (1969) (applying the rule and

collecting cases in which we cited the rule approvingly (quoting *Beck*, 200 Wash.

at 9-10)); *State v. Pugh*, 167 Wn.2d 825, 839-40 & n.8, 225 P.3d 892 (2009)

(reciting pre-*Beck* cases and explaining how *Beck* distilled older holdings into its

six-part test), *id*. at 840 ("contrary to Pugh's argument, in this state the res gestae

exception did not require that the statements always had to be exactly

contemporaneous with the occurrence of the event").  We should continue to

follow our precedent.

III. <u>Right to Counsel and To Present a Defense</u>

I also write separately because it is not entirely clear to me that we should continue to follow the rule that the federal and state constitutions give coextensive protections to the accused's right to counsel and to present a defense. *See* majority at 28, 42. While I acknowledge we have followed that approach in the past, it should not bind future decisions should we be convinced to discard inadequate federal standards. *See In re Pers. Restraint of Williams*, 198 Wn.2d 342, 363, 496 P.3d 289 (2021) (creating a new conditions of confinement standard under article I, section 14 after reasoning that "the federal deliberate indifference standard is inadequate to address claims arising under" our state constitution.).

I concede this case is not a good vehicle to explore that question given the lack of adequate argument. But I note that "[w]e have 'a duty, where feasible, to resolve constitutional questions first under the provisions of our own state constitution before turning to federal law.'" *State v. Gregory*, 192 Wn.2d 1, 14, 427 P.3d 621 (2018) (plurality opinion) (internal quotation marks omitted) (quoting *Collier v. City of Tacoma*, 121 Wn.2d 737, 745, 854 P.2d 1046 (1993)).

IV. <u>Adultification</u>

Lastly, I am concerned that the Court of Appeals opinion in this case shows a lack of due regard for the circumstances and life experiences of young people

8

*State v. Luna*, No. 103251-0 (González, J., concurring)

like Luna.  In describing Luna's actions, the Court of Appeals suggested Luna

wanted to fight:

> Luna could have declined to give HD her address. She could have
> stayed inside and not come to the door when SPT arrived. She could
> have called the police if she feared for her safety or she could have
> sought support from her stepfather, brother, or boyfriend, all of whom
> were in the house at the time. Instead, Luna armed herself with a
> pocketknife and went outside. She held the knife behind her back while
> arguing with SPT and at no point did she warn SPT not to come near
> her. At no point during her interaction with SPT did she call for help
> from someone inside the house.

*State v. Luna*, No. 57943-0-II, slip. op. at 18-19 (Wash. Ct. App. June 11, 2024)

(unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2057943-0-

II%20Unpublished%20Opinion.pdf.

This language insinuates that Luna is to blame for being the subject of a ploy

to get her into a fight by other young people who came to fight her at her home.  It

also characterizes a teenager's reaction to scary, unpredictable circumstances as

itself criminal.  It fails to evaluate the reasonableness of Luna's actions from her

perspective, as is required by the law of self-defense.  *See e.g.*, *State v. Brightman*,

155 Wn.2d 506, 521, 122 P.3d 150 (2005).

We must do better.  *See* Letter from Wash. Sup. Ct. to Members of Judiciary

& Legal Cmty. 1 (June 4, 2020).[1]  "'[C]hildren are different,'" and, as the majority

---

[1] https://www.courts.wa.gov/content/publicUpload/Supreme% 20Court% 20News/Judiciary%
20Legal% 20Community% 20SIGNED% 20060420.pdf [https://perma.cc/QNT4-H5P7]

9

*State v. Luna*, No. 103251-0 (González, J., concurring)

properly recognizes, we must stop adultifying children. *State v. Houston-Sconiers*, 188 Wn.2d 1, 8, 391 P.3d 409 (2017) (alteration in original) (quoting *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)); *State v. Anderson*, 200 Wn.2d 266, 312, 516 P.3d 1213 (2022) (Yu, J., concurring in dissent) ("One result of . . . adultification bias is that 'juvenile offenders of color are seen as more blameworthy and deserving of harsher punishment' than their white counterparts." (quoting GENDER & JUST. COMM'N, WASH. CTS., *2021: How Gender and Race Affect Justice Now* 453 (2021)); *see also In re Pers. Restraint of Frazier*, 4 Wn.3d 1, 36, 558 P.3d 451 (2024) (Whitener, J., dissenting) ("Misconceptions and stereotypes lead to implicit biases against youth of color."). In short, I pause to note that the words quoted from the Court of Appeals opinion below remain harmful.

With these observations, I respectfully concur.

_____
González, J.

_____
Gordon McCloud, J.

_____
Montoya-Lewis, J.

_____
Mungia, J.

10